FILED
2014 Mar-18  PM 12:03
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **REBECCA KAY SNOW,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| **v.** ) | Civil Action Number |
| ) | **7:13-cv-1188-AKK** |
| **CAROLYN W. COLVIN,** ) | |
| **ACTING COMMISSIONER OF** ) | |
| **SOCIAL SECURITY** ) | |
| **ADMINISTRATION,** ) | |
| ) | |
| Defendant. ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Rebecca Kay Snow brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of the adverse decision of the Administrative Law Judge ("ALJ"), which has become the final decision of the Commissioner of the Social Security Administration ("SSA"). For the reasons stated below, the ALJ's decision, specifically his findings regarding the impact of carpal tunnel syndrome on Snow's ability to work, is not supported by substantial evidence. Therefore, the Commissioner's decision is remanded for further proceedings consistent with this opinion.

# I. Procedural History

Snow filed her applications for Title II disability insurance benefits[1], (R. 254–57), and Title XVI Supplemental Security Income, (R. 258–265), on June 28, 2010, alleging a disability onset date of June 18, 2004, (R. 296), which she later amended to June 28, 2010, (R. 33) due to carpal tunnel syndrome, high blood pressure, anxiety, chronic back pain, chronic neck pain, depression, and nerve damage, *id*.  After the SSA denied her applications on July 5, 2010, (R. 145–48), Snow requested a hearing, (R. 156–58). At the time of the hearing on August 6, 2012, Snow was forty years old and had a high school education. (R. 35). Although the record indicates she had some experience working as a cook and a maid, (R. 323), the ALJ determined that Snow had no past relevant work, (R. 22, 55). Snow has not engaged in substantial gainful activity since June 28, 2010, her application date. (R. 14).

The ALJ denied Snow's claim on August 30, 2012, (R. 9–29), which became the final decision of the Commissioner when the Appeals Council refused to grant review on April 26, 2012, (R. 1–7).  Snow then filed this action pursuant

---

[1] The SSA denied Snow's disability insurance benefits application because Snow had not worked long enough to earn disability insurance benefits. (R. 145). Snow did not request a hearing regarding this claim. (R. 156). Consequently, the ALJ only considered the Supplemental Security Income application, which is the only matter before this court.

to section 1631 of the Act, 42 U.S.C. § 1383(c)(3).  Doc. 1.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence."  *See id*.  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the court must affirm the Commissioner's factual findings

even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i)(I)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis.  20 C.F.R. § 404.1520(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)     whether the claimant is currently unemployed;

(2)     whether the claimant has a severe impairment;

(3)     whether the impairment meets or equals one listed by the Secretary;

(4)    whether the claimant is unable to perform his or her past work; and

(5)    whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *Id.* at 1030 (citing 20 C.F.R. § 416.920(a)-(f)). "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

Lastly, where, as here, a plaintiff alleges disability because of pain, she must meet additional criteria. In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Barnhart*, 921 F.2d 1221, 1223 (11th Cir. 1991). Specifically,

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[2]

---

[2] This standard is referred to as the *Hand* standard, named after *Hand v. Heckler*, 761 F.2d 1545, 1548 (11th Cir. 1985).

*Id*.  However, medical evidence of pain itself, or of its intensity, is not required:

> While both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, *neither requires objective proof of the pain itself*.  Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard *a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself.  See* 20 CFR §§ 404.1529 and 416.929; *Hale* [*v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)].

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added).  Moreover, "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223.  Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find a disability unless the ALJ properly discredits the claimant's testimony.

Furthermore, when the ALJ fails to credit a claimant's pain testimony, the ALJ must articulate reasons for that decision:

> It is established in this circuit that if the [ALJ] fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the [ALJ], as a matter of law, has accepted that testimony as true.  Implicit in this rule is the requirement that such articulation of reasons by the [ALJ] be supported by substantial evidence.

*Hale*, 831 F.2d at 1012.  Therefore, if the ALJ either fails to articulate reasons for

refusing to credit the plaintiff's pain testimony, or if the ALJ's reasons are not supported by substantial evidence, the court must accept as true the pain testimony of the plaintiff and render a finding of disability.  *Id.*

## IV.  The ALJ's Decision

In performing the Five Step sequential analysis, the ALJ initially determined that Snow had not engaged in substantial gainful activity since the date of her application, and therefore met Step One.  (R. 14).  Next, the ALJ acknowledged that Snow's severe impairments of diabetes mellitus, hypertension, coronary artery disease, obesity, carpal tunnel syndrome, degenerative disc disease in the lumber and cervical spine, depression, and panic disorder met Step Two. *Id.* The ALJ then proceeded to the next step and found that Snow did not satisfy Step Three since she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  *Id.*  Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four, where he determined that Snow

> has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 416.967(a) except that the claimant can
> occasionally balance, stoop, kneel, crouch, or crawl; the claimant can
> perform no more than frequent fine and gross manipulation
> bilaterally; the claimant must avoid concentrated exposure to extreme
> cold or heat and must avoid all exposure to hazardous, moving
> machinery and unprotected heights; the claimant can understand,
> remember, and carry out simple but not detailed or complex

> instructions; the claimant is limited to occasional decision making
> with only occasional changes in the workplace setting; interaction
> with the public, coworkers, and supervision must be occasional.

(R. 17). Lastly, in Step Five, the ALJ considered Snow's age, education, work experience, and RFC, and determined, based on the Medical Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2, section 201.27 and on the testimony of a vocational expert ("VE"), that "there are jobs that exist in significant numbers in the national economy that [Snow] can perform." (R. 22). Because the ALJ answered Step Five in the negative, he determined that Snow was not disabled. (R. 23).

## V. Analysis

The court now turns to Snow's contentions that (1) the ALJ erred by affording little weight to the opinions of Dr. John Goff, (2) the ALJ erroneously evaluated the report of Dr. Asad Chaudhary, (3) the ALJ's assessment of Snow's credibility applied improper standards and was not supported by substantial evidence, and (4) the ALJ's finding that Snow's impairments, as a whole, were not disabling was not supported by substantial evidence. The court will examine each contention in turn.

### A. Dr. John Goff

Snow first argues that the ALJ erred by affording little weight to the

opinions of Dr. John Goff. Dr. Goff, a psychologist, examined Snow twice, in February 2005, (R. 526–34), and in October 2011, (R. 556–65). Dr. Goff conducted both exams at the request of Snow's attorneys in conjunction with Snow's applications for Social Security benefits. (R. 526, 556). During the 2011 examination[3], Dr. Goff reviewed Snow's medical records and medical history, observed Snow's behavior and mental status, reviewed the report he prepared in association with his 2005 examination of Snow, and administered several psychometric tests. (R. 556–60). Based on his examination, Dr. Goff concluded that Snow was "functioning at the low end of the low average range of psychometric intelligence," which represented a cognitive decline from her 2005 examination, and that she had "deficits in manual dexterity." (R. 561). He diagnosed Snow with moderate to severe major depressive disorder and agoraphobia with panic attacks. *Id.* With regard to the later condition, Dr. Goff noted that it had improved somewhat since 2005, although some of Snow's agoraphobia seemed to have been replaced by Snow's concerns about her physical health. (R. 560).

   Dr. Goff also prepared a medical source statement indicating, in his opinion,

---

[3] Snow primarily contends that the ALJ erred by affording little weight to the 2011 examination, but notes that Dr. Goff "diagnosed similar mental impairments with similar limitations pursuant to the 2005 examination." Doc. 7 at 3 n. 1.

the extent to which Snow's mental condition would impair her ability to work. (R. 563–565). Dr. Goff indicated that Snow's ability to understand, remember and carry out complex instructions and repetitive tasks, maintain attention and concentration for extended periods, adhere to a schedule, maintain regular attendance, be punctual, and respond appropriately to changes in the workplace would be extremely impaired as a result of her condition. (R. 564–65). He indicated that Snow's ability to be aware of hazards and take appropriate precautions, respond to customary work pressures, complete a normal workday and work week without interruption from psychologically-based symptoms, perform at a consistent pace without frequent rest periods, sustain a routine without special supervision, and understand, remember, and carry out simple instructions would be markedly impaired. *Id.*

The ALJ gave Dr. Goff's opinion little weight. (R. 21). In reaching this conclusion, the ALJ noted that the limitations Dr. Goff attributed to Snow were not supported by the reports of two other psychologists who examined Snow. *Id.* Additionally, the ALJ found that the limitations Dr. Goff attributed to Snow were not supported by records from Indian Hills Mental Health Center, where Snow has received treatment since at least 2003, (R. 459), or by Snow's "presentation at the hearing," (R. 21). The ALJ noted that Snow's "testimony and presentation during

her mental health treatment supports broad activities of daily living and higher level of function than indicated by Dr. Goff." *Id.*

The ALJ's decision to give little weight to Dr. Goff's opinion is supported by substantial evidence. As the ALJ noted, the significant functional limitations opined by Dr. Goff are inconsistent with reports prepared by psychologists Dr. Jerry Hart and Dr. Jerry Gragg, who examined Snow at the request of the Disability Determination Service. (R. 425, 522). Dr. Hart examined Snow in June 2004.[4] (R. 522–25). Dr. Hart concluded that Snow was of "probable average intelligence." (R. 525). He diagnosed Snow with panic disorder with agoraphobia and major depressive disorder, which was in partial remission. *Id.* He noted that Snow had better control of her panic attacks than she had in the past, although he attributed this to "a more constricted lifestyle in which she is not exposed much to social situations," and that her depression, which he noted seemed "secondary to the situations in her life," was "under control now with medication." *Id.* He indicated that he "believed that [Snow was] able to handle her own financial affairs and live independently." *Id.*

---

[4] Contrary to Snow's contention that "the ALJ gave only partial weight to Dr. Hart's report without explaining which portions he accepted or rejected and why," doc. 7 at 13, the ALJ explicitly stated that he only afforded partial weight to Dr. Hart's opinion "[d]ue to the remoteness of said opinion," (R. 21). At the time the ALJ issued his opinion, Dr. Hart's report was over eight years old.

Dr. Gragg examined Snow in October 2010. (R. 425–427). During the examination, Snow told Dr. Gragg that she found her anti-depressants and anxiety medication "helpful," and, tellingly, that she was "seeking disability benefits based on physical issues." (R. 426). Dr. Gragg concluded that Snow was of "low average" intelligence. (R. 26). He diagnosed Snow with depressive disorder, which he noted seemed "to be reasonably well controlled with medications," and commented that "individuals who are suffering with depressive mood [] will often do better when they are goal directed and have tasks to occupy their time. From this perspective, it appears that gainful employment would likely be helpful to . . . Snow." *Id.* In marked contrast to the limitations assessed by Dr. Goff, Dr. Gragg stated that:

> it appears that [Snow] would be able to respond appropriately to supervision, and she seems to have adequate social skills [to] relate to others. Her intellectual functioning is such as to allow her to understand, remember, and carry out instructions. Further, it appears that she would be able to handle work-related stressors effectively.

(R. 427). In sum, neither Dr. Hart nor Dr. Gragg's reports support a finding that Snow is functionally limited to the degree indicated by Dr. Goff.

The ALJ's decision to give little weight to Dr. Goff's opinions is also supported by records from the Indian Hills Mental Health Center, where Snow has received mental health treatment since at least 2003. Snow's treatment at Indian

Hills consisted of biannual appointments to receive medication refills, (R. 53), and

she did not participate in the center's counseling program, *see, e.g.*, (R. 536).

Indian Hills' records indicate that Snow routinely reported feeling "fine," (R. 414,

680) and denied feeling depressed, hopeless, or worthless or experiencing suicidal

or homicidal ideations, (R. 414, 680, 686). Many of the records note that Snow

was experiencing reduced signs and symptoms of depression, (R. 471, 546, 683),

and some indicate that "medications manage all [her] symptoms," (R. 414, 537).

This is not to say that Snow's mental health was unremarkable during the decade

Indian Hills provided her with care. The records indicate that in 2003 she

demonstrated an inability to cope with stress created by family problems (R. 461,

467, 468), that in recent years she has become preoccupied with her health (R.

686, 689), that health care professionals at Indian Hills believed Snow's "lack of

social connectiveness" was a barrier to her treatment, *see, e.g.*, (R. 546), and that

on one occasion she reported experiencing auditory hallucinations, (R. 536).

Nonetheless, as a whole, Snow's records from Indian Hills suggest that Snow's

condition was well-controlled by medication. They do not indicate that Snow is

functionally limited to the degree opined by Dr. Goff. In particular, they provide

no support for the low level of cognitive functioning that informed many of Dr.

Goff's limitations.

Snow's attempt to argue to the contrary are unavailing. Snow argues that Dr. Goff's opinion about the severity of Snow's symptoms is supported by Indian Hills' records because they indicate that she began receiving treatment for panic disorder with agoraphobia as early as 2003, that medication is only partially effective in treating her symptoms[5], that she is preoccupied with her physical health, and that her lack of social connectedness is a barrier to her treatment. Doc. 7 at 15–16. None of these factors provide support for Dr. Goff's limitations, the gist of which was that Snow's cognitive functions were so impaired that she would have marked difficulty performing even simple tasks.

Snow argues also that the ALJ's decision to afford little weight to Dr. Goff's opinions is inconsistent with 20 C.F.R. 416.927, which provides the SSA with guidelines for evaluating opinion evidence. Doc. 7 at 9, 12, 20. The regulation provides that the SSA will consider "the following factors in deciding the weight [it] give[s] to any medical opinion": examining relationship, treatment relationship, supportability, consistency with the record as a whole, specialization,

---

[5] In support of her contention that medication is only partially effective, Snow cites a treatment plan report, dated July 7, 2011, which states that "some [signs and symptoms] remain."(R. 546). However, that same report indicates that the last contact between Snow and Indian Rivers staff was a doctors' appointment on April 6, 2011. A progress notes report prepared in conjunction with that appointment states that "medications manage all symp[toms]." (R. 537). Moreover, as previously indicated, even if Snow continued to suffer from symptoms of depression, Indian Hills records indicate that the center's staff consistently considered her condition either to be improving or to be completely controlled by medication.

and other factors, including the medical professional's understanding of the SSA's disability programs. 20 C.F.R. 416.927(c). Snow argues that "the ALJ's rejection of Dr. Goff's report violated the regulations" by failing to give greater weight to Dr. Goff's opinions because they were supported by extensive testing, consistent with the records from Indian Rivers[6], and Dr. Goff had experience evaluating applicants for Social Security benefits. Doc. 7 at 20. Snow, however, provides no authority supporting her implicit argument that an ALJ must weigh all of the factors listed in 20 C.F.R. 416.927(c) equally. More basically, her argument ignores that while 20 C.F.R. 416.927(c) provides ALJs with guidance when evaluating medical opinion evidence, an "ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion" so long as the ALJ "state[s] with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006) (emphasis added) (citing *Sharfaz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)). Here, the ALJ gave little weight to Dr. Goff's opinion because it was inconsistent with the rest of

---

[6] As the court explained above, Dr. Goff's opinions are not consistent with the records from Indian Rivers.

the record.[7] That is all the law requires him to do.

Snow's argument that the ALJ impermissibly substituted his own judgement for that of an examining physician, doc. 7 at 19; doc. 9 at 6, is similarly unconvincing. Snow is correct that an ALJ may not arbitrarily substitute his own judgment for that of a medical professional. *See Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). However, while Snow contends that the Commissioner takes "an unjustifiably narrow view of the concept of improper substitution of judgment," doc. 9 at 6, by arguing that the ALJ's actions were permissible because he "did not diagnose any conditions, provide treatment, or do anything ordinarily done by a doctor," *id.* (quoting doc. 8 at 13), Snow asks the court to take a similarly unjustifiably broad view of the concept of improper substitution of judgment and find that the ALJ improperly substituted his judgment for Dr. Goff's by "ignor[ing] testing administered by Dr. Goff and other data the neuropsychologist obtained during both evaluations and record reviews." Doc. 9 at 6. First, the ALJ did not "ignor[e]" Dr. Goff's test results and reports; as explained above, he considered them and gave valid reasons for affording them little weight. Second, were courts to find that ALJs impermissibly substitute their own opinions

---

[7] Snow argues that Dr. Goff's 2010 evaluation is consistent with his 2005 evaluation. Doc. 7 at 16. Even if this is true, that Dr. Goff's opinions are consistent with his own previously-held opinion hardly overcomes the fact that they are inconsistent with medical records from other sources and the opinions of other physicians.

for those of medical experts any time ALJs reject the opinions of those medical experts, the ALJ's role in Social Security proceedings would be essentially meaningless. *See Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996) (describing the ALJ's duty to "carefully weigh the evidence, giving individualized consideration to each claim that comes before him").

In sum, substantial evidence supports the ALJ's assessment that Dr. Goff's opinion conflicted with the rest of the record. Consequently, the ALJ did not err when he afforded little weight to Dr. Goff's opinion.

## B. Dr. Asad Chaudhary

Snow next contends that the ALJ erroneously evaluated the report of Dr. Asad Chaudhary, a physician who examined Snow in October, 2010. The ALJ addressed Dr. Chaudhary's report as follows:

> The undersigned has considered Dr. Asad Chaudhary's physical examination and gives it partial weight. Though Dr. Chaudhary expressed no opinions as to the claimant's physical limitations, his physical findings were helpful in the formation of the residual functional capacity and it is of note that he reported the claimant had no physical limitations.

(R. 21) (internal citations omitted). The ALJ's statement that "[Dr. Chaudhary] reported no physical limitations is incorrect.[8] Dr. Chaudhary's report actually

---

[8] The court also notes that the ALJ's statement that "Dr. Chaudhary expressed no opinion as to the claimant's physical limitations" is at odds with his statement that "[Dr. Chaudhary] reported the claimant had no physical limitations"; a plausible explanation is that the ALJ meant that Dr. Chaudhary expressed no opinion about Snow's physical limitations in the workplace, but

states that, due to carpal tunnel syndrome, Snow experiences "limitation of wrist range of motion secondary to pain and some impairment of gross manipulative skills on exam." (R. 433). The issue of whether and the extent to which carpal tunnel syndrome limits Snow's manual mobility is critical to determining whether she is disabled because the ALJ limited Snow to sedentary work, (R. 17), and an inability to engage in frequent fine and gross manual manipulation severely limits and may preclude sedentary employment, *see* SSR 96-9p (explaining that "any *significant* manipulative limitation of an individual's ability to handle and work with small object with both hands will result in a significant erosion of the unskilled occupational base") (emphasis in original); (R. 59) (VE's testimony before the ALJ stating that a limitation to only occasional fine and gross manipulation "would severely limit any sedentary work).

Consequently, the Commissioner's argument that the ALJ's misstatement of the record "is harmless error because the ALJ's RFC finding limited Plaintiff to no more than frequent fine and gross manipulation, taking into account Dr. Chaudhary's assessment," doc. 8 at 15 (citing (R. 17)), is unavailing. First, although the Commissioner is correct that the ALJ characterized it as such, *see* (R. 17), the court fails to see how "frequent fine and gross manipulation" is a

---

it is impossible to reach that conclusion without extrapolating.

limitation, *see* SSR 96-9p (explaining that performing the full range of sedentary work requires "repetitive hand-finger action). Second, the ALJ's mischaracterization of Dr. Chaudhary's report is prejudicial to Snow because, by the ALJ's own admission, Dr. Chaudhary's report was "helpful in the formation of the [RFC]." (R. 21). Put differently, the ALJ based his finding that Snow could engage in frequent fine and gross manipulation on Dr. Chaudhary's report, which, the ALJ erroneously stated, indicated that Snow had no physical limitations. As the court explained above, Dr. Chaudhary's report, in fact, stated that carpal tunnel syndrome limited Snow's ability to move her wrists and grossly manipulate objects, and those impairments may dictate that the Commissioner find Snow to be disabled. In the final analysis, because the ALJ's RFC was influenced, if not based, on a mischaracterization of the record, the court cannot say that the RFC is supported by substantial evidence. Consequently, the Commissioner's final decision is due to be remanded. On remand, the ALJ should determine whether the limitations indicated in Dr. Chaudhary's report impact Snow's RFC, and if that, in turn, is grounds for finding her to be disabled.

C. Snow's credibility

The ALJ's error in mischaracterizing Dr. Chaudhary's report is compounded by the fact that, as Snow next contends, he also erred in assessing the credibility of

Snow's statements regarding her physical limitations.

> In determining the credibility of the individua''s statements, the adjudicator must consider *the entire case record*, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 96-7p (emphasis added). In discrediting Snow's statements, the ALJ

explained that:

> The claimant is independent in her personal care and grooming. The claimant testified she helps her youngest daughter get ready for school, but reported that her daughter was largely self sufficient. Her oldest daughter helps her with household chores and cooking . . . . The claimant can drive a car and goes to church two nights a week. The claimant does her own grocery shopping, participates in daily exercise on the treadmill, and spends her free time watching television or reading, on occasion. The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

(R. 20–21). This account of Snow's daily activities does not reflect the record as a

whole with regard to the limitations caused by carpal tunnel syndrome Snow

reports[9] experiencing in association with those activities. With regards to her

personal care, Snow reports that she experiences difficulty manipulating buttons

and tying shoe laces, and consequently wears clothes with no buttons and slide-on

shoes. (R. 311). She can no longer style her hair. (R. 311, 314). She is unable to

---

[9] These limitations are described in two self assessments Snow provided to the SSA. (R. 311–320). The ALJ's opinion contains no indication that he considered them.

open pill bottles and consequently one of her daughters sorts her medication into a pill organizer for her. (R. 316). She cooks, but struggles to cut vegetables and flip meat, (R. 312), and mainly makes "simple things that can be put in the oven that I don't have to stir a lot or flip[]" (R. 316). Turning a door knob hurts her wrists, so she replaced most of the doorknobs in her home with push handles. She performs chores, but has trouble pulling clothes out of the dryer, (R. 312), sweeping with an ordinary broom, *id.*, and can no longer use a screwdriver, (R. 316). When she writes with a pencil or pen, her "hand burns and go[es] numb." (R. 313). She can drive, but it causes her hands to "swell and go numb," and if she must go far, she gets one of her daughters to drive. (R. 312). In sum, when assessing Snow's credibility, the ALJ failed to consider Snow's self-reported limitations associated with her daily activities. On remand, the ALJ may determine that there is good cause to reject Snow's account, but it may not be ignored out of hand as here.

Because the issue for the ALJ to resolve on remand essentially is whether Snow's impairments, as a whole, render her disabled, the court declines to address Snow's fourth and final contention.

## VI. Conclusion

Based on the foregoing, the court concludes that the ALJ's determination that Snow is not disabled is not supported by substantial evidence and applied

incorrect legal standards. Therefore, the Commissioner's final decision is remanded for further proceedings consistent with this opinion. A separate order in accordance with the memorandum of decision will be entered.

Done this 18th day of March, 2014.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE